## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | |
|---|---|
| STACEY R. NICKELL, ROBERT RICE, and JANNE RICE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DELPHI AUTOMOTIVE LLP, DELPHI AUTOMOTIVE SYSTEMS, LLC, FURUKAWA ELECTRIC CO., LTD., LEAR CORP., LEONI AG, SUMITOMO ELECTRIC INDUSTRIES, LTD, S-Y SYSTEMS TECHNOLOGIES GMBH, YAZAKI CORP., and YAZAKI NORTH AMERICA INC., <br><br> Defendants. | Case No.   5:12-0079 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Stacey Nickell, Robert Rice, and Janne Rice, on behalf of themselves and all others similarly situated, upon personal knowledge as to their conduct and upon information and belief as to all other matters, based on the investigation by her counsel, against all Defendants named herein, and demanding a jury trial of all claims properly triable thereby, complains and alleges as follows:

### I.  INTRODUCTION

1.  This case arises out of a long-running conspiracy extending from at least January 1, 2000, through at least January 1, 2010, at minimum, among Defendants and their co-conspirators, the purpose and effect of which was to rig bids for, and to fix, raise, stabilize, and maintain prices, of automotive wire harnesses and related products sold indirectly to Plaintiffs and other Class members defined below.

2.     Defendants and their co-conspirators formed an international cartel illegally to restrict competition in the automotive wire harness and related products market, specifically targeting and injuring indirect-purchaser consumers and affecting billions of dollars of commerce throughout the United States.  The conspiracy included communications and meetings in which defendants agreed to eliminate competition and to rig bids for, and to fix the prices of automotive wire harnesses and related products.  As a result of Defendants' bid-rigging and price-fixing conduct, Plaintiffs and class members have been injured in their business and property by paying more for automotive wire harnesses and related products then they otherwise would have paid in the absence of defendants' conspiracy.

## II.     JURISDICTION AND VENUE

3.     This action is brought under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) to secure equitable relief against the defendants due to their violations of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as under the antitrust and other laws of the states listed herein, to obtain restitution, recover damages, and to secure other relief against the defendants for violations of those state laws.

4.     This Court has subject-matter jurisdiction of the federal antitrust claims asserted under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1), under Title 28, United States Code, Sections 1331 and 1337.

5.     This Court has subject-matter jurisdiction of the state-law claims asserted under Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds $5 million exclusive of interest and costs, class members are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this district; (b) participated in the sale and distribution of automotive wire harnesses and related products throughout the United States, including in this district; (c) had substantial contacts with the United States, including this district; and/or (d) was engaged in an illegal conspiracy that was

directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

7.     Venue is proper in this district under Title 28, United States Code, Section 1391(b) and (c), because during the Class Period, many of the Defendants transacted business, were found, or had agents in this district, and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

8.     Defendants conduct business throughout the United States, including in this jurisdiction, and they purposefully avail themselves of the laws of the United States, including specifically the laws of the individual states listed herein.  Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial, and reasonably-foreseeable effect on such commerce.

9.     Defendants' conspiracy to rig bids and fix prices of automotive wire harnesses and related products substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly and/or through their agents, engaged in activities affecting each state.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale of wire harnesses.  Defendants produced, promoted, sold, marketed, and/or distributed automotive wire harnesses and related products, thereby purposefully profiting from access to consumers in each such state.  As a result of the activities described herein, Defendants:

   a.     Caused damage to the residents of the states identified herein;

   b.     Caused damage in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state;

   c.     Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of automotive wire harnesses and related products (and services related to such marketing) in each such state; and

3

d.      Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damages) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of automotive wire harnesses and related products in which they are used in each such state.

10.     The conspiracy described herein adversely affected every person nationwide, and, more particularly, consumers in each of the states identified in this Complaint who indirectly purchased Defendants' automotive wire harnesses and related products.  Defendants' conspiracy has resulted in an adverse monetary effect on the class members of each state identified herein.

11.     Prices of automotive wire harnesses and related products in each state identified herein were raised to supra-competitive levels by Defendants and their co-conspirators. Defendants knew that commerce in automotive wire harness and related products, and that new motor vehicles containing those harnesses and related products, would be adversely affected by implementing their conspiracy in each state identified herein.

### III.   DEFINITIONS

12.     "Automotive Wire Harness Systems" refers to automotive electrical distribution systems used to direct and control electrical components, wiring, and circuit boards; and to related products, including automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

13.     "Class Period" refers to the time period of January 1, 2000 to the date this complaint is filed.

14.     "OEM" means any original equipment manufacturer of new motor vehicles.

### IV.   THE PARTIES

#### A.     The Plaintiffs

15.     Plaintiff Stacey R. Nickell, a resident and citizen of Raleigh County, West Virginia, purchased one or more Automotive Wire Harness Systems indirectly from one or more of the Defendants during the Class Period, for end use and not for resale.

16.     Plaintiff Robert Rice, resident and citizen of Wayne County, West Virginia, purchased one or more Automotive Wire Harness Systems indirectly from one or more of the Defendants during the Class Period, for end use and not for resale.

17.     Plaintiff Janne Rice, a resident and citizen of Wayne County, West Virginia, purchased one or more Automotive Wire Harness Systems indirectly from one or more of the Defendants during the Class Period, for end use and not for resale.

18.     Plaintiffs Stacey Nickell, Robert Rice, and Janne Rice ("Plaintiffs") and all class members were injured in their business or property as a result of Defendants' illegal big-rigging and price-fixing agreement because they paid more for products containing Automotive Wire Harness Systems then they would have absent such illegal conduct.

### B.     The Defendants

19.     Defendant Delphi Automotive LLP is headquartered in Troy, Michigan, and is a limited liability partnership under the laws of England and Wales. Defendant Delphi Automotive, LLP, together with its subsidiaries and affiliates, manufactured, marketed, sold and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

20.     Defendant Delphi Automotive Systems, LLC, is incorporated in Delaware and is headquartered in Troy, Michigan. Delphi Automotive Systems, LLC, manufactures, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. Delphi Automotive, LLP, and Delphi Automotive Systems, LLC are collectively referred to as "Delphi."

21.     Defendant Furukawa Electric Co., Ltd. ("Furukawa") is a Japanese corporation. Defendant Furukawa manufactured, marketed, sold and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

22.     Defendant Lear Corp. ("Lear") is a Delaware corporation with its principal place of business in Southfield, Michigan.  Defendant Lear manufactured, marketed, sold and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

23.     Defendant Leoni AG ("Leoni") is a German corporation.  Defendant Leoni manufactured, marketed, sold, and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

24.     Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo") is a Japanese corporation.  Defendant Sumitomo manufactured, marketed, sold, and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

25.     Defendant S-Y Systems Technologies, GmbH ("S-Y Systems") is a German corporation.   Defendant S-Y Systems manufactured, marketed, sold, and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district during the Class Period.

26.     Defendant Yazaki Corp. is a Japanese corporation.   Defendant Yazaki manufactured marketed, sold, and/or distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

27.     Defendant Yazaki North America Inc. is an Illinois corporation and has its principal place of business in Canton Township, Michigan.  It is a subsidiary of and owned and controlled by its parent, Yazaki Corp. (Yazaki Corp. and Yazaki North America Inc. are collectively referred to herein as "Yazaki".).

28.     Each Defendant named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  Each Defendant that is a wholly-owned subsidiary of a foreign parent in the United States is an agent for its parent company.

## C.     The Co-Conspirators

29.     Various persons and entities, presently unknown to Plaintiffs, participated as co-conspirators with Defendants in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.  Plaintiffs reserve the right to add some or all of them as named Defendants or named Co-Conspirators at a later date.

30.     The acts charged herein have been done by Defendants and their Co-Conspirators, or were authorized, ordered, done, or ratified by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendants' business or affairs.

## V.     NATURE OF ACTION

31.     This is a class action brought against Defendants Delphi, Furukawa, Lear, Leoni, Sumitomo, S-Y Systems, and Yazaki, (collectively "Defendants"), the largest manufacturers and sellers of automotive wire harnesses and related products, for engaging in a conspiracy to unlawfully fix, stabilize, maintain, and raise the prices of Automotive Wire Harness Systems, as defined above, sold to automobile manufacturers for installation in vehicles manufactured and sold in the United States and elsewhere.

32.     Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing Automotive Wire Harness Systems or who purchased replacement Automotive Wire Harness Systems during the Class Period.

33.     Defendants manufacture, market, and sell Automotive Wire Harness Systems throughout the United States for installation in vehicles manufactured and sold in the United

States, in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

34.     Defendants and their Co-Conspirators agreed, combined and conspired to rig bids for, inflate, fix, raise, and artificially maintain and stabilize prices of Automotive Wire Harness Systems.

35.     Antitrust law enforcement authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems.  As part of its ongoing criminal investigation, the United States Department of Justice ("DOJ") has brought criminal charges against Defendant Furukawa and its employees and is investigating other manufacturers of Automotive Wire Harness Systems.  The Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of Defendants' offices.    The European Commission Competition Authority ("Commission") has also conducted raids at several Defendants' European offices.

36.     Defendant Furukawa and three of its employees have each pled guilty to a criminal information brought by the United States, charging that, from at least as early as January 2000 and continuing until at least January 2010 (for Furukawa), and varying time periods within that period for the three employees, Furukawa, its employees, and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.

37.     As part of its plea agreement, Furukawa has agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

38.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and Class members, as defined below, paid artificially inflated prices for Automotive

Wire Harness Systems installed in their vehicles and Defendants were unjustly enriched during the Class Period.  Plaintiffs has thereby suffered injury to her business or property.

## VI.   DEFENDANTS' WRONGFUL COURSE OF CONDUCT

39.     Defendants supplied Automotive Wire Harness Systems to automobile manufacturers for installation in vehicles manufactured and sold in the United States and elsewhere.

40.     When purchasing Automotive Wire Harness Systems, automobile manufacturers issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts.   Automotive parts suppliers submit quotations, or bids, to the automobile manufacturers in response to RFQs, and the automobile manufacturers award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process for a particular model begins approximately three years prior to the start of production.  Japanese automobile manufacturers procure parts for vehicles manufactured in the United States both in Japan and in the United States.

41.     From at least as early as January 2000 and continuing until at least January 2010, the exact dates being unknown, Defendants and their Co-Conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere. The combination and conspiracy was in unreasonable restraint of interstate and foreign trade and commerce.

42.     The combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.

**A.**     **Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs**

43.     In a market characterized by free and open competition, falling material and labor costs should lead to decreased prices because each firm competing in the market would expect that other competitors would attempt to take advantage of their lower costs to lower their prices in order to increase their market share.

44.     In a market where competitors are engaging in a price-fixing conspiracy, they do not lower prices even when faced with decreasing input costs.   Such price decreases are unnecessary because the conspirators know that they will not lose market share as a result of price competition.

45.     The price of Automotive Wire Harness Systems substantially increased during the Class Period, while significant input costs virtually remained the same.   Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems.   Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs.   In a market characterized by free and open competition, steady input costs should not result in rising prices.

**B.**     **The Structure and Characteristics of the Automotive Wire Harness Systems Market Made Collusion Attractive**

46.     The structure and other characteristics of the market for Automotive Wire Harness Systems are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.   The Automotive Wire Harness Systems market has the following characteristics conducive to collusion: high barriers to entry, inelasticity of demand, high concentration, and opportunities to conspire.

**1.**     **The Automotive Wire Harness Systems Market Has High Barriers To Entry**

47.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.   Where, however, there are significant barriers to entry, new entrants are

less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a price-fixing conspiracy.

48.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face costly and lengthy start-up costs and other barriers, including multi-million dollar costs associated with acquiring manufacturing plants and equipment, energy, transportation distribution infrastructure, and skilled labor, and overcoming long-standing customer relationships.

49.     In addition, OEMs cannot easily shift demand among different Automotive Wire Harness Systems suppliers after they select a supplier because the OEMs enter into multi-year contracts with a supplier who specially designs the features of the Automotive Wire Harness Systems to meet the requirements of their vehicles.  The Automotive Wire Harness Systems an OEM purchases are integrated with the electronics, mechanics, thermal distribution, and other features of a particular vehicle model.

**2.     There is Inelasticity of Demand for Automotive Wire Harness Systems**

50.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is generally said to be "inelastic" if an increase in the price of a product does not materially affect demand, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

51.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost revenue.

52.     Demand for Automotive Wire Harness Systems is highly inelastic because there are no close substitutes for these products.  In addition, purchasers or lessees of vehicles must

purchase Automotive Wire Harness Systems as an essential part of their vehicles, even if the prices are raised or maintained at supra-competitive levels.

### 3.    The Market for Automotive Wire Harness Systems is Highly Concentrated

53.    Defendants dominate the Automotive Wire Harness Systems market.  Six of the Defendants control almost 90% of the global market and four of the Defendants control almost 77% of the global market:  Yazaki controls approximately 30%;  Sumitomo controls approximately 24%; Delphi controls approximately 16.71%; Lear controls approximately 5%; Furukawa controls approximately 4%; and Leoni controls approximately 6%.

### 4.    Defendants Had Ample Opportunities to Conspire

54.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the formation, operation, and furtherance of the conspiracy.  For example, Defendants have regularly attended the annual Detroit Auto Show, which provided the means and opportunity to form and further the conspiracy alleged herein.

## C.    Government Investigations

55.    A globally-coordinated antitrust investigation is underway in the United States, Europe, and Japan aimed at suppliers of Automotive Wire Harness Systems.  The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  DOJ Spokeswoman Gina Talamona stated: "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers."

56.    On February 8, 2010, the Commission executed surprise raids at the European offices of certain Defendants as part of an investigation into anti-competitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  On June 7, 2010, the Commission carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems.  Specifically, Commission investigators raided the offices of Leoni, SY Systems, and Yazaki.  "The Commission has reason to believe that the companies

concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," a Commission official said in a statement.

57.     Defendants S-Y Systems and Leoni have stated they are cooperating with the antitrust investigators.

58.     Lear's Chief Executive Officer Robert Rossiter has stated that Lear was notified by the Commission that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.

59.     Defendants Delphi have admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market." Delphi stated that it is cooperating fully with European competition authorities.

60.     In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003.

61.     Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of the DOJ's investigation. The FBI executed warrants and searched the offices of these companies, including Yazaki's subsidiary in Canton Township, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

62.     To obtain search warrants, the United States was legally required to demonstrate the existence of probable cause, accepted by a federal jurist, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant. That belief, supported by affidavits or testimony, must be grounded on reasonably trustworthy information.

**D.**     **Guilty Pleas**

63.     On September 29, 2011, the DOJ announced that Defendant Furukawa had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers.  Three Furukawa executives, Tetsuya Ukai (Manager, Unit Chief, and General Manager in the Honda Sales Division), Junichi Funi (Sales Representative and Manager of the Honda Sales Division), and Hirotsugu Nagata (Marketing Manager and Chief Financial Offer) also agreed to plead guilty and to be incarcerated in the United States for a year and a day to 18 months.

64.     On October 24, 2011, Junichi Funo and Hirotsugu Nagata lodged guilty pleas to one-count felony charges brought by the DOJ.  The plea hearing for Tetsuya Ukai is set for November 10, 2011.

65.     Junichi Funo was employed by Furukawa in Japan as a sales representative in the Honda Sales Division from April 2003 until August 2003, and then by a subsidiary of Furukawa in the United States as Assistant General Manager for Honda Sales from August 2003 until March 2009, and as Manager of the Honda Sales Division of Furukawa in Japan from March 2009 until at least July 2009.

66.     Hirotsugu Nagata was employed by a subsidiary of Furukawa in the United States as General Manager of Sales from January 2004 until November 2007, Marketing Manager from January 2004 until March 2009, and Chief Financial Officer from January 2004 through at least June 2009.

67.     Tetsuya Ukai was employed by Furukawa in the Honda Sales Division from April 2003 until July 2005, as Unit Chief in the Honda Sales Division from July 2005 until April 2007, and as General Manager of Honda Sales Division from April 2007 until at least July 2009.

68.     According to the information filed, Furukawa and its co-conspirators carried out the conspiracy by:

      a.     Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

      b.     Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

      c.     Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

      d.     Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

      e.     Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

      f.     Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

      g.     Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

      h.     Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

      i.     Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

69.     Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, stated: "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in

cars sold to U.S. consumers." She further stated: "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

## VII.    MANNER AND MEANS OF THE CONSPIRACY

70.    For purposes of forming and carrying out the charged combination and conspiracy, Defendants did those things that they combined and conspired to do, including, among other things:

a.    Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b.    Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.    Agreeing during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d.    Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.    Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.    Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.    Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

       h.      Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

       i.      Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

## VIII.  TRADE AND COMMERCE

71.     During the period covered by this Complaint, Defendants sold to automobile manufacturers located in various states in the United States substantial quantities of Automotive Wire Harness Systems shipped from outside the United States and from other states in a continuous and uninterrupted flow of interstate and foreign trade and commerce.  In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Automotive Wire Harness Systems by Defendants, as well as payments for Automotive Wire Harness Systems sold by Defendants, traveled in interstate and foreign trade and commerce.  The business activities of Defendants in connection with the production and sale of Automotive Wire Harness Systems that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

## IX.  THE PASS-THROUGH OF THE OVERCHARGES TO CONSUMERS

72.     Defendants' conspiracy to rig bids for, and raise, fix, or maintain the price of Wire Harness Systems at artificial levels resulted in harm to Plaintiffs and the indirect-purchaser consumer classes alleged herein because it resulted in their paying higher prices for new motor vehicles containing Wire Harness Systems and/or for replacement Wire Harness Systems than they would have paid in the absence of defendants' conspiracy.  Indeed, Sharis Pozen of the U.S. DOJ has stated that U.S. consumers were affected by the conspiracy.

73.     Once a Wire Harness System leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  Wire Harness Systems are identifiable, discrete physical objects that do not change form or become an indistinguishable part of new motor vehicles in which they are contained.

74.     Wire Harness Systems follow a traceable physical chain from the defendants to OEMs to purchasers of new motor vehicles containing Wire Harness Systems.

75.     Just as Wire Harness Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Wire Harness Systems affect prices paid by indirect purchasers of new motor vehicles containing Wire Harness Systems.

76.     Because defendants control the market for Wire Harness Systems, there are virtually no choices for persons and businesses that require new motor vehicles containing Wire Harness Systems other than buying such products manufactured by a direct purchaser that paid supra-competitive prices for Wire Harness Systems to defendants because of defendants' conspiracy alleged herein.

77.     When distribution markets are highly competitive, as they are in the case of new motor vehicles containing Wire Harness Systems as components, all of the overcharge will be passed through to ultimate consumers, such as the indirect-purchaser plaintiffs and class members.

78.     Hence, the inflated prices of new motor vehicles containing Wire Harness Systems resulting from defendants' bid rigging and price-fixing conspiracy have been passed on to plaintiffs and the other class members by OEMs and dealers.

79.     The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

80.     As Professor Jeffrey K. McKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the

University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

81.    The purpose of the conspiratorial conduct of the defendants was to raise, fix or stabilize the price of Wire Harness Systems and, as a direct and foreseeable result, new motor vehicles containing such systems. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable. In those cases, the in dependent variable changes are explained by changes in a multitude of variables – when all such variables may be changing simultaneously.. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Wire Harness Systems on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Wire Harness Systems affects changes in the price of new motor vehicles. In such models, rather than being treated as the dependent variable, the price of Wire Harness Systems is treated as an independent or explanatory variable. The model can isolate how changes in the price of Wire Harness Systems impact the price of new motor vehicles containing such systems while controlling for the impact of other price-determining factors.

82.    Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (i.e. variable) cost or an indirect (i.e., overhead) cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct

costs.  Here, Wire Harness Systems are a direct (and significant) cost of new motor vehicles containing such systems.

83.     Other factors that lead to the pass-through of overcharges include: (i) whether price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing decisions are based on cost; and (iv) whether the overcharge affects variable, as opposed to overhead, costs.  All of these factors were present in the Wire Harness Systems market during the Class Period.  The precise amount of such an impact on the prices of new motor vehicles containing Wire Harness Systems can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution.

84.     Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for new motor vehicles containing Wire Harness Systems.  These inflated prices have been passed on to them by OEMs and dealers.  Those overcharges have unjustly enriched defendants.

## X.     CLASS ACTION ALLEGATIONS

85.     Plaintiffs brings this action on behalf of herself and as a class action under Rule 23 of the Federal Rules of Civil Procedure for injunctive relief on behalf of all members of the following plaintiffs class ("the Nationwide Class"):

> All persons and entities residing in the United States who, during the Class Period, indirectly purchased in the United States, Automotive Wire Harness Systems, for personal use and not for resale (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

86.     Specifically excluded from the foregoing Class and the Class listed below are Defendants; the officers, directors or employees of any Defendant; the legal representatives and heirs or assigns of any Defendant; and the named affiliates and Co-Conspirators.  Also excluded are any federal, state, or local governmental entity, any judicial officer presiding over this action,

and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

87.     Plaintiffs also brings this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective West Virginia statutes(s), on behalf of all members of the following class. (the "Indirect Purchaser West Virginia Class"):

> a.     **West Virginia**: All persons and entities in West Virginia, who as residents of West Virginia and during the Class Period, indirectly purchased in West Virginia, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

88.     Plaintiffs do not know the exact number of Class members.  However, Plaintiffs believe there are hundreds of thousands of Class members, geographically dispersed throughout the United States (and hundreds of thousands of class members in West Virginia), such that joinder of all Class members would be impracticable.

89.     Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs would fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class members.  Plaintiffs have retained competent counsel experienced in class action and complex antitrust and consumer-protection litigation.

90.     Common questions of law and fact exist, including:

> a.     Whether Defendants and their Co-Conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain, or stabilize the price of, or allocate the market of, Automotive Wire Harness Systems sold in the United States;

> b.     What was the duration and extent of the contract, combination, or conspiracy;

> c.     Whether Defendants and their Co-Conspirators were participants in the contracts, combinations, or conspiracies alleged herein;

d.      Whether Defendants and their Co-Conspirators engaged in conduct that violated Section 1 of the Sherman Act;

e.      Whether Defendants and their Co-Conspirators engaged in unlawful, unfair, or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of wire harnesses sold in and/or distributed in the United States;

f.      Whether Defendants and their Co-Conspirators engaged in conduct in violation of the West Virginia antitrust laws as alleged below;

g.      Whether Defendants' and their Co-Conspirators' anticompetitive conduct caused prices of Automotive Wire Harness Systems to be artificially inflated to non-competitive levels;

h.      Whether Defendants and their Co-Conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of Class members;

i.      Whether Defendants and their Co-Conspirators fraudulently concealed the existence of their unlawful conduct;

j.      Whether Plaintiffs and Class members are entitled to injunctive relief; and

k.      Whether Plaintiffs and Class members were injured by Defendants' conduct and, if so, the appropriate measure of damages.

91.    These and other questions of law and fact are common to Class members and predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages, and restitution.

92.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy because:

a.      It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.      It would be virtually impossible for all Class members to intervene as party-plaintiffs in this action;

c.      It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation to obtain redress for their economic injuries;

d.      It is appropriate for treatment on a fluid-recovery basis, which obviates any manageability problems; and

e.      It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

93.     This case is also appropriate for certification as a class action because the Defendants have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

94.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XI.     ACTIVE CONCEALMENT

95.     Plaintiffs and Class members did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after September 29, 2011, when the investigations by the DOJ became public, because Defendants and their Co-Conspirators actively and fraudulently concealed the existence of their contract, combination, and conspiracy.  Because Defendants' agreement, understanding, and conspiracy were kept secret, Plaintiffs and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially-high prices for Automotive Wire Harness Systems and the products in which they were used.

96.     Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy, were actively concealed and carried out in a manner that precluded detection.

97.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.  As alleged above, Defendants had secret discussions about price and output.

Defendants employed means to keep their conduct secret, including using code names and meeting at private residences or in remote locations.

98.     As a result of Defendants' active concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that Plaintiffs and Class members have as a result of the anticompetitive conduct alleged herein.

## XII.   VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

99.     Plaintiffs incorporate by reference each and every allegation in the paragraphs above as fully set forth herein.

100.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2000, and continuing through the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their Co-Conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially rig bids and fix, raise, stabilize, and peg prices for Automotive Wire Harness Systems in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

101.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct alleged above, and the following, among others:

a.     Fixing, raising, stabilizing, and pegging the price of Automotive Wire Harness Systems;

b.     Submitting rigged bids for the award and performance of certain Automotive Wire Harness Systems contracts;

c.     Allocating among themselves markets for Automotive Wire Harness Systems; and

d.      Allocating among themselves and collusively reducing the production of Automotive Wire Harness Systems.

102.    The combination and conspiracy alleged herein has had the following affects, among others:

a.      Price competition in the sale of Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the United States;

b.      Prices for Automotive Wire Harness Systems sold by Defendants and their Co-Conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.      Those who purchased Automotive Wire Harness Systems directly or indirectly from Defendants and their Co-Conspirators have been deprived of the benefit of free and open competition.

103.    Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems purchased indirectly from Defendants and their Co-Conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for the purchase or lease of new motor vehicles, or for replacement products, containing Automotive Wire Harness Systems.

104.    Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

### (Violation of West Virginia Antitrust Law)

105.    Plaintiffs incorporate by reference each and every allegation in the paragraphs above as fully set forth herein.

106.    By reason of the foregoing, Defendants have violated West Virginia Code Section 47-18-l *et se.q*

107.   The Plaintiffs and Defendants are "persons" as defined in W.Va. Code § 47-18-2(a).

108.   The defendants operated in "trade or commerce" as defined in W.Va. Code § 47-18-2(b).

109.   Automotive Wire Harness Systems, as described above, is a "commodity" as defined in W.Va. Code §47-18-2(c).

110.   During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Wire Harness Systems in West Virginia.

111.   During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, did the following in addition to the misconduct described above to create and maintain their contract, combination or conspiracy to fix, control, maintain or stabilize prices of Automotive Wire Harness Systems sold and/or distributed in West Virginia, in violation of W.Va. Code §§ 47-18-1 *et seq.*:

      a.   Participated in meetings, conversations and communications in the Untied States and elsewhere with potential competitors to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems to be sold in West Virginia and the United States;

      b.   Agreed, during those meetings, conversations, and communications, to charge prices of Automotive Wire Harness Systems at certain elevated levels to be sold in West Virginia and the United States; and

      c.   Issued price quotations in accordance with the agreements reached.

112.   The horizontal price-fixing conspiracy substantially effected the people of West Virginia and restrained trade or commerce in West Virginia, and was designed to have, and did

have, a substantial and adverse impact on prices for Automotive Wire Harness Systems in West Virginia during the Class Period.

113.   As a result, Plaintiffs and other members of the Class have been injured in their business or property, and have sustained damages in an amount to be determined at trial.

### Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

114.   Plaintiffs incorporate by reference each and every allegation in the paragraphs above as fully set forth herein.

115.   Defendants have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits.

116.   Under common-law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and Class members in the following states: West Virginia.

117.   Plaintiffs and members of the West Virginia Independent Purchaser Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as set forth below:

A.   That this Court determine that the Sherman Act, West Virginia antitrust law claims alleged herein may be maintained as class actions under Rule 23(a), (b)(2), and (b)(3) of the Federal Rule of Civil Procedure, as informed by the West Virginia state class action laws;

B.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudicated and decreed to be:

1.   A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

     2.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the West Virginia antitrust laws identified in the Second Claim for Relief herein;

     3.   Acts of unjust enrichment as alleged in the Third Claim for Relief herein.

C.    That Plaintiffs and the Classes alleged herein recover damages, to the maximum extent allowable under such laws as provided by West Virginia antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against Defendants in an amount to be trebled to the extent permitted by such laws, including W.Va. Code § 47-18-9;

D.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

F.    That Plaintiffs and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.    That Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.    That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances, including punitive damages.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated:  January 18, 2012

By: _____
Eric B. Snyder (WV Bar # 9143)
Aaron E. Robinson (WV Bar #11565)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV  25301
Telephone – 304-345-6555
Facsimile – 304-342-1110
esnyder@baileyglasser.com

*Attorneys for Plaintiffs and the Proposed Classes*